IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IFS North America, Inc., <br><br> Plaintiff, <br><br> v. <br><br> EMCOR Facilities Services, Inc., <br><br> Defendant. | Case No. |

## COMPLAINT

Comes now Plaintiff IFS North America, Inc. ("IFS"), by and through its attorneys, and pleads as follows:

### NATURE OF ACTION

1. IFS brings this breach of contract action against EMCOR Facilities Services, Inc. ("Emcor") for Emcor's breach and anticipatory repudiation of the parties' February 6, 2019, Master Agreement and accompanying order forms. Emcor has refused to pay more than $11 million it owes to IFS under the clear terms of the parties' contract.

2. Nearly five years ago, these two sophisticated companies entered a heavily negotiated software subscription and implementation agreement. *See* Ex. A, Feb. 6, 2019, Master Agreement. Under the agreement, IFS would provide software licenses and implement a software solution to replace Emcor's admittedly outdated, patchwork legacy system. Emcor, in turn, was obliged to pay for the licenses and implementation and organize and upload its data to that new environment.

3. IFS worked closely with Emcor to configure the software for Emcor's business needs, including promptly and professionally working out Emcor-created kinks in the implementation.

4. In the summer of 2022, the parties signed a new agreement that allowed Emcor more time to pay and extended the subscription term. The CFO of Emcor's parent company wrote that he "***look[ed] forward to partnering with IFS*** on the next phase of the system implementation" and thanked IFS for its "***support, engagement and commitment*** to a successful implementation and partnership." But Emcor missed its very first payment due under the new order form.

5. Only weeks later, in October 2022, Emcor's project manager left the company, and Emcor suddenly purported to "cancel" the parties' contract, despite failing to identify with specificity any material failure by IFS.

6. Over the life of the parties' agreement, IFS has given Emcor numerous concessions—delaying payment collections, devising workarounds for functionalities Emcor had not previously requested, and restructuring the parties' agreement to reduce Emcor's financial obligations. The parties were obliged to work together. But Emcor now has repudiated its existing and future contractual obligations, causing IFS to suffer harm.

7. IFS is entitled to the benefit of its bargain and brings this suit to collect the more than $11 million it is due over the lifetime of the contract.

## THE PARTIES

8. IFS North America, Inc. ("IFS") is a Wisconsin corporation with its principal place of business located at 300 Park Boulevard, Suite 350, Itasca, Illinois 60143. IFS develops, supplies, and implements a variety of business software products for more than a million users around the globe.

9. EMCOR Facilities Services, Inc. ("Emcor") is an Ohio corporation with its principal place of business in Pennsylvania. Emcor provides commercial facilities management services. Emcor may be served by delivering a summons to its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

## JURISDICTION & VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. §1332. There is complete diversity between the parties because the parties are "citizens of different states," and the amount in controversy exceeds $75,000.

11. The parties consented to personal jurisdiction in this forum through the forum-selection clause contained within their February 6, 2019, Master Agreement.

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and because the Defendant conducts business in the Northern District of Illinois.

## BACKGROUND

13. In 2019, IFS agreed to provide complex software and implementation services to Emcor. Specifically, Emcor engaged IFS to provide and implement a Field Service Management software system. At various facilities nationwide, Emcor provides a host of services—security, snowplowing, maintenance, janitorial, and others. Each Emcor customer and facility imposes its own extensive, and often idiosyncratic, obligations.

14. IFS's software would make Emcor's contractual obligations readily accessible, understandable, and trackable, so its personnel could fulfill them. IFS's system would replace a patchwork of legacy systems, consolidating various functionalities into a single application.

15. IFS and Emcor entered a Master Agreement on February 6, 2019, wherein Emcor purchased five-year subscriptions to two sets of cloud-hosted software: IFS Field Service Management and IFS Planning & Scheduling Optimization. *See* Ex. A; Ex. B, Feb. 6, 2019, IFS Managed Cloud Services Order Form.

16. As part of its software subscription, Emcor purchased a limited number of user licenses. Consistent with Emcor's communicated needs at the time, Emcor purchased only 45 Customer Portal user licenses and 3,000 Technical Portal user licenses at the start. The parties' agreement provided that these licenses would increase to 150 and 10,000 licenses, respectively, over the course of five years. *See* Ex. B, at 1.

17. Pursuant to the 2019 Order Form, software subscription fees were due annually on February 6, with late fees accruing at 1.5 percent per month. Ex. B, at 2.

18. Emcor simultaneously signed an order form with IFS for implementation services. *See* Ex. C, Feb. 6, 2019, Professional Services Order Form. Although Emcor purchased software subscriptions for both Field Service Management software and Planning & Scheduling Optimization software (an optimization software), Emcor purchased implementation services for only Field Service Management software.

    **A.**    **IFS Commences Implementation Efforts.**

19. IFS embarked on a multi-phase process to implement the complex software solution for Emcor's business needs. IFS began configuring its Field Service Management software to manage Emcor's service requests, create work orders, administer service contracts, and provide other features. The implementation would proceed along different facets of Emcor's business offerings—first, work orders, later, snow-plowing, and, eventually, other services.

20. From the outset, the parties understood this implementation project would be a multi-year process. As for any substantial software implementation project for a sizable company,

Emcor took time to line up its internal team and resources. IFS worked closely with the Emcor team, including Sean Fisher, Emcor's Senior Director of Information Services, who served as the implementation project manager.

21. As with any complex software-implementation project, unforeseen challenges arose intermittently. No software product is perfect, but IFS and Emcor worked together closely to resolve each issue in turn.

22. Likewise, any complex software project requires tweaks along the way to configure the software for a client's specific functionalities. Complex software implementation is necessarily an iterative process.

23. The Emcor implementation project was progressing at an appropriate pace when, approximately one year in, the Covid-19 pandemic hit. Emcor apparently experienced significant economic strain due to the pandemic and asked to defer its payments owed to IFS. In the spirit of partnership and cooperation, IFS agreed and pressed forward with the implementation work.

24. To IFS's surprise, Emcor announced for the first time in 2021 that it would need IFS's system to support logins for **60,000 users**—despite purchasing user licenses for **less than twenty percent** of that target. Emcor works with approximately 9,500 business partners, which provide various kinds of facilities services. Emcor apparently intended—but did not disclose during the contract negotiations—that it planned for each individual subcontractor of those business partners to himself or herself be a software user. Emcor had purchased only 6,000 software user licenses—a number that was set to increase only to 10,000 users by the end of the five-year term. IFS's software was prepared to handle the planned (and purchased) 10,000-user load.

25. Emcor informed IFS that it planned to have these 60,000 users share usernames and logins, a "workaround" that would not work with IFS's software and would blatantly violate the license terms Emcor agreed to. *See generally* Ex. B, at 1-3.

26. Despite Emcor's overt plans to violate the parties' agreement, IFS again offered concessions to Emcor. IFS engineered a bespoke solution to meet Emcor's needs, building an easy-to-use, custom portal to handle the tens of thousands of users who would likely turn over multiple times per year. That portal then fed into the IFS Field Service Management software that Emcor had purchased. IFS renegotiated Emcor's licensing structure to account for the users Emcor failed to disclose up front.

B. **Emcor's Historical Data-Management Processes Create Challenges.**

27. With these user-license revisions in place, IFS's software was ready to intake Emcor's contract data. Emcor was responsible for contract data-uploading, and IFS provided instruction to Emcor for that process based on the requirements Emcor expressed to IFS. Although Emcor could have hired IFS to handle the data uploading, it opted to handle that process in-house.

28. But Emcor did not first clean up the decades-old contract data that had been housed in its legacy system.

29. Emcor thus attempted to load far too many—and far more than anticipated—rows of data into the software. This approach, combined with a greater-than-anticipated volume of data, caused the software system to slow down significantly.

30. Despite its own errors, Emcor shifted the blame to IFS. Emcor unilaterally—and without warning—sent a letter threatening to terminate the Master Agreement on March 2, 2022. Emcor complained that the contract-management system was not yet functional. And it said that

it should be responsible only for the user licenses it was actively using—not all the user licenses it was contractually obligated to pay for.

31. IFS again stepped in to fix a problem of Emcor's creation. IFS's President and Chief Technology Officer in turn both became personally involved in reaching a solution.

32. An IFS solution architect devised a different way to restructure the layout of Emcor's contract data, at no cost to Emcor. IFS also offered increased computing power to improve the contract loading even more.

33. Emcor was again off to the races, successfully loading its voluminous contracts by late summer 2022. Sean Fisher, Emcor's project manager, confirmed by email on June 30, 2022, that hundreds of thousands of lines of contract data were loading in hundredths of a second per line (and often faster). And Emcor president Mike McElrath concurred, describing the update as "positive progress."

34. IFS's workaround confirmed that Emcor's difficulties loading contracts into the system were caused primarily by Emcor's data structure—not by any inadequacy in IFS's software.

  **C.** **Emcor's Staff Turns Over, and the Company Looks for an Escape Hatch.**

35. Concurrent with the IFS-devised data solution, IFS simultaneously negotiated with Emcor a replacement order form. The replacement order form, executed June 27, 2022, was back-dated to February 2022, so Emcor's 2022 subscription fee would no longer be considered late. *See* Ex. D, Feb. 6, 2022, Order Form. The parties restructured the prior payment amounts and timing, gave Emcor additional cloud computing power, and extended Emcor's software subscription another three years. Ex. D, at 1-2.

36. Emcor said it was satisfied. Anthony Sada, CFO of Emcor Building Services (Emcor's parent company) wrote that he "look[ed] forward to partnering with IFS on the next phase of the system implementation." And Mr. Sada thanked IFS for its "support, engagement and commitment to a successful implementation and partnership."

37. Following the summer 2022 fix, IFS continued to implement the Field Service Management software for Emcor. IFS's and Emcor's teams were deeply engaged in the project, working closely over the ensuing months.

38. At no point did Emcor ever inform IFS of any persistent issue with loading or managing its contractual data. And in any event, IFS never was responsible for uploading Emcor's data into IFS's software.

39. Emcor's project manager, Sean Fisher, left his role in or around October 2022—in the midst of Emcor's contract-data cleanup and upload process. With Mr. Fisher's departure, much of Emcor's institutional knowledge surrounding the project left as well. And with the exit, Emcor's leadership and new IT leaders apparently developed buyer's remorse.

40. Despite having given no indication of persistent issues, Emcor sent another "contract-cancellation" letter to IFS in November 2022. Therein, Emcor alleged that there was "complete product failure" and again alleged that the IFS software was unable to handle significant volumes of contract data.

41. IFS's executives and Emcor's executives corresponded multiple times. Emcor raised the contract-loading lag—which had long since been resolved. And Emcor sometimes pointed to glitches in the Tech Portal's scrolling capabilities. But IFS had resolved the vast majority of those scrolling issues by that point. By October 2022, IFS had narrowed the scrolling issue from a general problem with scrolling in landscape view to a one-directional scrolling glitch

on a single tab on Emcor's unique configuration. That month, Emcor confirmed that all that remained was "discuss[ing] next steps." But rather than continuing to work with IFS, Emcor purported to cancel the contract unilaterally.

42. Under the language to which the parties agreed in 2022, Emcor's "sole and exclusive remedy" in the event of a breach of warranty (which did not occur) was for "IFS, in consultation with [Emcor], to use reasonable efforts consistent with industry standards to cure the defect or otherwise to redeliver the Application Software so that it substantially complies with the Software Documentation." Ex. D, at 3. So Emcor had to work with IFS, and IFS had the opportunity to cure. Only if IFS were unable to do so would Emcor have no further obligations to IFS.

43. Emcor failed to follow this agreed process. Emcor never identified any breach by IFS (there was none). Additionally, by failing to even *attempt* to identify a breach by IFS, Emcor denied IFS its contractual right to cure, a right that IFS holds even if in breach. Mr. Sada indicated that Emcor had returned to its outdated legacy system. Emcor refused to meet its ongoing payment obligations under the Master Agreement and software order form. It failed to make the payments due on October 6, 2022, and February 6, 2023, and therefore breached the Master Agreement. *See* Ex. D, at 2.

44. IFS thereafter invoked the Master Agreement's dispute resolution procedure in May 2023. IFS is still owed Emcor's 2022 and 2023 payments of $2,770,130 (inclusive of tax), along with future payments (for 2024, 2025, 2026, and 2027), as they become due. *See* Ex. D, at 2. In total, IFS is entitled to $11,379,480 over the lifetime of the parties' Master Agreement.

## CAUSE OF ACTION
### Breach of Contract

45. IFS restates the preceding paragraphs as though fully set forth herein.

46. IFS and Emcor had a valid contract. IFS offered to provide the software licenses and implementation services, as set forth in the parties' February 6, 2019, Master Agreement and accompanying order forms. *See* Exs. A-D. Emcor in turn accepted IFS's offer. The parties' contract was supported by consideration—IFS's provision of software licenses and services, and Emcor's corresponding agreement to pay for those licenses and services.

47. The parties set out ascertainable material terms in their Master Agreement and accompanying order forms, including, but not limited to, the number of software licenses that IFS would provide, a description of the implementation services that IFS would provide, and the specific amounts of money that Emcor would pay in exchange. In support of their intent to be bound and as evidence of their mutual assent, the parties executed the Master Agreement and accompanying order forms.

48. Pursuant to the Master Agreement, the June 2022 Order Form, and the invoices issued thereunder, Emcor was required to pay $1,318,815 by October 6, 2022, and $1,451,315 by February 6, 2023 (both inclusive of tax). Emcor has not made these payments and therefore is in breach.

49. Emcor likewise has committed an anticipatory repudiation of the contract, with respect to the amounts that will become due in February 2024, 2025, 2026, and 2027. Emcor purported to "terminate" the parties' agreement through two letters, sent to IFS on November 11, 2022, and December 22, 2022, respectively. Emcor therefore has renounced its duty to perform under the contract at any point in time. Emcor's anticipatory repudiation was without justification, as IFS has met its contractual obligations to provide software licenses, and Emcor has been unable to identify any persisting material issues for IFS to resolve.

50. IFS performed fully under the contract. It provided the software licenses that Emcor contractually agreed to pay for. And it provided the professional services to implement IFS software in Emcor's business.

51. Emcor's breach of contract has injured IFS because IFS has not received the monies it is owed under the contract.

52. All conditions precedent to filing this suit have been met. *See* Ex. A §5.1. IFS's and Emcor's respective executive officers met and attempted to resolve their issues, and the parties completed contractually required mediation, at which they reached an impasse.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in Plaintiff's favor and against Defendant as set forth below:

   a. For actual damages in an amount to be proven at trial;

   b. For pre- and post-judgment interest as permitted by law; and

   c. For such other legal and equitable relief as the Court deems fit and proper.

| | |
|---|---|
| Dated: January 29, 2024 | Respectfully submitted, |
| | */s/ Nicole O'Toole Peterson* |

        William D. Patterson (#6294533)
        Nicole O'Toole Peterson (#6330227)
        SWANSON, MARTIN & BELL, LLP
        330 N. Wabash, Suite 3300
        Chicago, IL 60611
        (312) 321-8445
        wpatterson@smbtrials.com
        npeterson@smbtrials.com

        Collin J. Cox (*pro hac vice* forthcoming)
        Johanna E. Smith (*pro hac vice* forthcoming)
        GIBSON, DUNN & CRUTCHER LLP
        811 Main Street, Suite 3000
        Houston, Texas 77002
        (346) 718-6604
        Fax: (346) 718-6941
        ccox@gibsondunn.com
        jesmith@gibsondunn.com

        **ATTORNEYS FOR PLAINTIFF**
        **IFS NORTH AMERICA, INC.**