# Exhibit A

DocuSign Envelope ID: B341B0DF-288D-450D-A40C-1226FF37B7F3

**MASTER AGREEMENT/SUBSCRIPTION**
**IFS NORTH AMERICA, INC.**



This IFS North America, Inc. Master Agreement ("Master Agreement") is made and into as of February 6, 2019, by and between IFS NORTH AMERICA, INC. ("IFS"), a Wisconsin corporation with its headquarter offices at 300 Park Boulevard, Suite 555, Itasca, IL 60143 and EMCOR FACILITIES SERVICES, INC. ("Licensee") an Ohio corporation with offices at 1700 Markley Street, Norristown, PA 19401, both together "Parties" and separately a "Party".

R E C I T A L

0.1 This Master Agreement, when signed by the Parties and combined with one or more Order Forms (as later defined) specifically referencing this Master Agreement and also signed by Licensee and signed and accepted by IFS (all such Order Forms being incorporated into this Master Agreement by this reference), creates various obligations between the Parties with respect to software products, related maintenance services, related professional services and/or hosting services, all as hereafter and therein set forth.

**1. DEFINITIONS**
The following terms, when used in this Master Agreement shall have the following meanings:

1.1 **"Order Form"** means a separately signed document referencing this Master Agreement which sets forth Products being purchased by Licensee under such specific terms as are set forth on that Order Form and the general terms set forth in this Master Agreement.

1.2 **"Products"** means any of the following, as later defined: Subscription, Software, IFS Managed Cloud Services, and/or Professional Services.

1.3 "**Software**" means application software from either IFS or a third party, and other software, including both data base and operating system software purchased by the Licensee pursuant to an Order Form.

1.3.1 **"IFS Application Software"** or "**IFSAS**" means the totality of the standard unmodified IFS application software modules and programs made available under this Master Agreement from IFS. It is limited to machine readable code (generally referred to as executable or object code) and the user instructions included on the electronic media containing the IFSAS ("**Documentation**"), as updated from time to time and released for general distribution. It does not include vocabularies and other items generally referred to as source code or descriptions in materials not contained on the IFSAS media or shipped with the media.

1.3.2 **"Third Party Application Software**" or **"TPAS"** means application software other than the IFSAS made available under this Master Agreement.

1.4 "**Current Release**" means the latest version of the IFSAS for general commercial distribution.

1.5 **"Professional Services"** means services provided by IFS to Licensee on a for fee basis pursuant to a Professional Services Order Form, whether they occur at Licensee's site, at IFS, through electronic media, or elsewhere. The most common Professional Services are training, consulting, installation, data conversions, and Customizations.

1.5.1 **"Customizations"** means any and all changes, modifications, or enhancements to the IFSAS, whether developed by Licensee, for Licensee by third parties, or by IFS under separate Order Form Statement(s) of Work, and regardless by whom paid.

1.5.2 **"Statement of Work" or "SOW"** means a separate document, to be referenced in an Order Form, for any Professional Services item requiring detail beyond simple Order Form listing.

1.6 **"Price"** means, with respect to this Master Agreement, the prices set forth on an Order Form for Products.

1.7 **"User"** means an individual (i.e. user log-in) who is granted access to use the IFSAS.

1.7.1 **"User Type"** means the metric for counting and controlling the number of Users granted access to use the IFSAS, as set forth on an Order Form.

1.7.1.1 **"Named User"** means a User who has a unique individual log-in to the IFSAS.

1.7.3 **"User Level"** means the maximum number of Users for each User Type, as set forth on an Order Form.

1.8 **"Subscription"** means the Licensee's subscription to use the IFSAS for the Term, and related maintenance, pursuant to the terms and conditions herein and in Order Forms.

1.9 **"Term"** means the duration of the Subscription set forth in the IFS Managed Cloud Services Order Form.

1.10 **"Documentation"** has the meaning ascribed to it in section 1.3.1.

1.11 **"Acceptance"** has the meaning ascribed to it in section 4.1.

1.12 **"Error"** means a failure to perform in substantial conformance with the Documentation.

1.13 **"Licensee-Induced Flaw"** means an Error that is the result of Licensee's incorrect or improper use of Software.

1.14 **"IFS Managed Cloud Services"** means those information technology cloud services described and set forth in the IFS Managed Cloud Services Order Form.

**2. LICENSE and PURCHASE**
2.1 **Grant.** Subject to all the terms and conditions of this Master Agreement (which includes all applicable Order Forms), Licensee may access and use, for the Subscription Term elected, but not own, the Software in Licensee's business, and for

Licensee's and its affiliates' and client's operations. Licensee has the right to receive one copy of the Software, in executable object code form, and one copy of the Documentation. Licensee may use such copy solely for the purpose expressed herein and may, to the extent strictly necessary, make additional copies for the exclusive purposes of backup, testing and archiving. Such additional copies shall contain copyright, disclaimers, proprietary notices and other markings corresponding to those which exist on the copy received by Licensee from IFS. IFS Managed Cloud Services is not a prerequisite for use of the licenses granted to Licensee, which are granted on a stand-alone basis. However, Licensee retains all ownership rights to Licensee or its client's data which shall be delivered to Customer upon expiration or termination of this Agreement.

**2.2 Purchase.** Subject to all the terms and conditions of this Master Agreement (which includes all applicable Order Forms), Licensee shall purchase the Products at the Prices as set forth in the Order Forms.

**2.3 Security.** Licensee shall use, and shall not attempt to defeat, the present and any future security system of the Software.

**2.4 Ownership**. The IFSAS, Customizations and their derivative works (as used in copyright law) are the property of IFS. Standalone code, written by or on behalf of Licensee, without use of or access to the IFSAS source code or Confidential Information, is not Customizations.

**2.5 Assignment.** Except to Licensee's Affiliates, Licensee may not transfer or assign the Software, this Master Agreement or Licensee's rights and obligations under this Master Agreement. Any such attempt will be void.

**2.6 Source Code Escrow.** IFS has an Escrow Agreement with InnovaSafe, Inc. ("Escrow Agent"), under which Licensee will become and remain enrolled as a "Beneficiary", upon payment of, and while current with, the applicable fees required. IFS shall direct Escrow Agent to release the source code to Licensee upon written notice from Licensee to IFS and occurrence of any of the following events: i) IFS voluntarily files for complete dissolution, ii) IFS voluntarily ceases providing Maintenance of the Current Release, or iii) IFS voluntarily or involuntarily files for bankruptcy. The current annual escrow fee is $750. After 2018, the annual escrow fee will be based on the then current price and will be revised annually.

## 3. PAYMENT

**3.1** All Prices are expressed in United States currency unless otherwise noted.

**3.2 Related Costs.** In addition to the Price, Licensee shall pay IFS, or certify that payment has been made, for any sales, use, or other tax (other than based on IFS income, employees or personal property) or related payment applicable to the sale of the Products, and actual shipping and related insurance charges. If any taxing authority advises IFS that such sales, use, or other tax (other than based on IFS income, employees or personal property) is due and owing, then Licensee shall promptly pay the claimed amount. If Licensee disputes the taxing authority's imposition of the tax or the amount, and Licensee separately challenges the tax, IFS will reasonably cooperate, at Licensee's expense, in such effort.

## 4. DELIVERY and ACCEPTANCE

**4.1 Acceptance.** All Order Form Products are, without in any way affecting Licensee's warranty rights as set forth below in section 6, deemed accepted by Licensee upon delivery which, if Software or other materials, means shipment from IFS or its agent; if Professional Services or other services (such as phone support, or training or consulting, regardless of where provided), means as performed or as otherwise specified in a SOW ("Acceptance").

**4.2 Changes.** Licensee cannot make any changes to delivery, installation, or other performance of services schedules once agreed except prior to Acceptance, and only with IFS' prior written consent (which shall not be unreasonably withheld), and then only pursuant to a replacement Order Form including, as applicable, a revised SOW. Such changes may involve administrative rescheduling charges

## 5. LICENSEE'S AND IFS' REMEDIES

**5.1 Disputes**. Any controversy or claim arising out of or relating to this Master Agreement, including its formation, performance, or breach, can only be settled in accordance with the following sequence of dispute resolution procedures. First, executive officers of the Parties shall meet to attempt to resolve their issues based upon advance written submissions to each other and within 60 days of the written submission, if the Parties day to day relationship managers, including the IFS regional office management, are unable, after reasonable effort, to resolve their issues. Second, if the executive officers are unable to resolve their issues within 60 days of the written submission, the Parties shall submit to mediation under the Commercial Rules of the American Arbitration Association in the location of the Party against whom the claim is made. Thereafter, any issues still remaining unsettled can only be resolved in the applicable federal or state courts for DuPage County, Illinois.

**5.2 Termination.** This Master Agreement may be terminated by either Party in the event the other Party fails to perform any of its material obligations hereunder and fails to remedy such nonperformance within the time permitted herein within 30 days after written demand. Where the failure relates to a section 6.1 warranty, only the procedures and remedies of section 6 specifically set forth apply. Where the failure relates to section 7 proprietary property and confidentiality or section 6.4 access, notwithstanding any other procedure set forth herein, the Party claiming damage may immediately seek injunctive or other immediate and equitable remedy in addition to damages as permitted herein. Where the failure relates to all other matters, each Party is entitled to written notice and 30 days to cure the failure except that for subsequent failures of the same kind (e.g. second failure to make timely payment) the notice cure period is 5 days.

   **5.3 After Termination**. Within 90 days of the expiration or termination of this Master Agreement for any reason, both Parties shall return to the other as appropriate or destroy, all Product and Confidential Information (as later defined) and IFS shall deliver to Licensee all Licensee and client data within 30 days of the effective termination, in the other's possession or, with the other's approval, destroy such information with certification by an officer. The Parties' obligations relating to Confidential Information survive the termination of this Master Agreement.

**6. WARRANTY AND LIMITATION OF LIABILITY**
  **6.1 Product Warranties.**
    6.1.1 **Application Software**. a) IFS warrants that it has the right to sell or license the IFS and Third Party Application Software to Licensee pursuant to the terms of this Master Agreement and, to the extent authorized, passes on to Licensee all available TPAS warranties; b) IFS warrants that the IFS Application Software, when used as authorized herein, does not infringe a third party's property rights.

    6.1.2 **Professional Services**. IFS warrants that the Professional Services will be performed in a professional manner by qualified personnel.

    6.1.3 **Malicious Codes.** IFS represents and warrants to Licensee that the Products and Software to its knowledge, are free of viruses, worms, time bombs, Trojan horses, spyware, or other malicious or "self-help" code. IFS shall defend and indemnify and hold Licensee harmless against any claim to the extent attributable to a violation of the foregoing representation and warranty.

  **6.2 No Other Warranty. EXCEPT AS OTHERWISE STATED HEREIN, THE WARRANTIES SET FORTH IN THIS MASTER AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, ARISING OUT OF OR IN CONNECTION WITH THIS MASTER AGREEMENT, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

  **6.3 Limitation of Liability.**
    6.3.1 **Remedy for Breach of Warranty Other Than Non-Infringement.** Except for breach of Section 6.1.3, for which IFS is additionally liable for the defense and indemnification obligation therein, in the event any Product sold by IFS does not conform to its above respective section 6.1 warranty, IFS' entire liability and Licensee's sole remedy will be, in IFS' sole discretion, either a) the correction of the non-conforming Product by replacement or rework, or b) if a) is not commercially practical, the termination of this Master Agreement.

    6.3.2 **Remedy for Breach of Non-Infringement Warranty**. In the event of a breach by IFS of the non-infringement warranty in section 6.1.1(b), IFS shall indemnify, defend, and hold harmless Licensee its affiliates, employees and directors from and against any loss, cost damage, claim, expense, or liability incurred as a result of an allegation of such breach and be responsible for Licensee's reasonable attorney fees and any damages so long as Licensee promptly gave IFS notice of such claim, offered to turn over defense of the claim to IFS, and fully informed and cooperated with IFS in the defense of the claim. The requirement for prompt notice of a claim shall only apply to the extent that IFS is prejudiced.

    6.3.3 **Remedy for Non-Warranty Breach of Master Agreement.** Except for a breach of confidentiality, in the event of a non-warranty breach of this Master Agreement by IFS Licensee's sole recovery will be for actual damages.

    6.3.4 **IN NO EVENT WILL IFS OR LICNESEE BE LIABLE UNDER THIS MASTER AGREEMENT FOR ANY CONSEQUENTIAL, GENERAL, INCIDENTAL, OR SPECIAL DAMAGES EVEN THOUGH THE PARTIES MAY BE AWARE OF THE POSSIBILITY OF SUCH DAMAGES AND IN NO EVENT WILL ITS ACCUMULATED LIABILITY FOR ALL OBLIGATIONS AND LIABILITIES UNDER THIS MASTER AGREEMENT EXCEED TWENTY-FIVE PERCENT OF THE ANNUAL SUBSCRIPTION PRICE.**

      6.3.4.1 **Exceptions**. The following are exceptions to the limitations and exclusions in section 6.3.4:

(a) Breaches of section 2.1;
(b) Breaches of section 6.1.3;
(c) Claims for breach of section 7 (Confidentiality);
(d) IFS' defense and indemnification obligation in section 8.4.3;
(e) Claims for payments owed to IFS.

With respect to IFS' liability related to any indemnified claim described in section 8.4.3, IFS' liability will be for direct damages only not to exceed $5 Million dollars.

    6.3.5 **Disclaimer**. Subject to any applicable Service Level Targets and penalties in a Managed Cloud Order Form, IFS does not represent or warrant that the Software will be constantly available, error free or never interrupted. While IFS attempts to identify the functions of the IFSAS which may be of particular benefit to Licensee, only Licensee is in a position to understand its current and future business needs and commit the necessary complementary resources to benefit from the software and, therefore, is solely responsible for the selection, use, and suitability of the Software for Licensee's purposes, even if IFS has been informed of such purposes.

    6.3.6 **Licensee Induced Flaws**. If Licensee notifies IFS of a suspected IFSAS "Error" that IFS determines is a Licensee-Induced Flaw, as opposed to an actual Error in that Software, IFS will have no obligation to take any action to correct the Licensee-Induced Flaw. IFS will share with Licensee the results and reasoning for its determination. Upon the agreement of the parties in writing, IFS may attempt to correct the Licensee-Induced Flaw, and Licensee shall pay IFS.

  **6.4 Access.** Neither IFS nor any third party under IFS's control

will access or view Licensee's content or data, except as reasonably necessary to provide the Software Subscription and ONLY with Licensee's prior written approval. Reasonably necessary actions include (i) responding to support requests, (ii) detecting, preventing or otherwise addressing security, fraud, unlawful or technical issues; and (iii) enforcing the terms of this Master Agreement. Upon notice and agreement of Licensee, Licensee shall provide IFS or its designated agent (who has executed Licensee's standard confidentiality agreement) reasonable access to its records to perform any warranty or other services when and as required and to determine if the Products provided to Licensee are being used in conformance to this Master Agreement. Should IFS find that Licensee is not in compliance with the terms of this Master Agreement, Licensee shall, in addition to paying additional fees as may be due for such use, be responsible for all reasonable costs of the audit including all related expenses, both out of pocket and for IFS or other personnel time not to exceed $5000.00. Failure to provide such access is a material breach of this agreement. Any audit by a provider of TPAS purchased under this Master Agreement will be between Licensee and that provider, provided that the provider of TPAS must execute Licensee's standard confidentially agreement and will only have access to Licensee's records. For the avoidance of any doubt, the TPAS provider will not have any access to Licensee's systems. IFS will provide support and assistance to Licensee and that provider in completing it in order to minimize any disruption.

## 7. CONFIDENTIALITY

**7.1 Third Party Proprietary Property.** The IFSAS and some of the other Products provided pursuant to this Master Agreement constitute the trade secrets and proprietary properties of IFS or of other licensing suppliers pursuant to agreements with those suppliers. Licensee shall include on any permitted copies made of the Products, the same proprietary notices or legends that appear on the materials it receives. Licensee shall use reasonable efforts to procedurally protect those materials and the information they contain from transfer, disclosure, or use by any employee, entity, or other person, other than as expressly permitted herein. Licensee shall notify IFS or the third party owner, as appropriate, immediately of any violation of this provision it becomes aware of or suspects.

**7.2 Confidential Information.** Licensee and IFS acknowledge that, in connection with the Products purchased or licensed pursuant to this Master Agreement, IFS has provided or may provide Licensee with discs, tapes, or other software media; documents; or information through discussions relating to its or its licensors' products, processes, programs, plans, customers, or the like and that IFS may receive non-public information concerning the business of Licensee. All such information, whether of a Trade Secret or non-Trade Secret nature, is "Confidential Information". The Parties shall keep Confidential Information in the strictest confidence and trust, and shall not disclose it, other than to Licensee's or IFS' own employees, affiliates, contractors or agents who are obligated to maintain confidentially and have a need to know the Confidential Information in furtherance of this Master Agreement, without the express written consent of IFS or Licensee, as applicable.

7.3 It shall not be a breach of this section for the receiving Party to disclose the disclosing Party's confidential information as may be required by operation of law, court order, rules or regulation, including the rules of the New York Stock Exchange or legal process, provided that the receiving party provides prior notice of such disclosure to the disclosing party unless expressly prohibited from doing so by a court, arbitration panel or other legal authority of competent jurisdiction.

## 8. MISCELLANEOUS

**8.1 Entire Agreement and Further Actions.** This Master Agreement, which includes the Order Forms referenced herein, constitutes the entire agreement between the Parties with regard to the Products, superseding any prior proposals or agreements. Any changes to this Master Agreement, including to its Order Forms, must be in writing, signed by a duly authorized representative of both Parties, and identified as an amendment. Any provisions of this Master Agreement prohibited by law will be, without invalidating the remaining provisions hereof, ineffective to the extent of the prohibition. The Parties shall take any and all further actions required to fully effect the provisions and intent of this Master Agreement.

**8.2 Governing Law.** The laws of the State of Illinois govern this Agreement, and all proceedings arising out of this Agreement, without regard to its conflict of laws provisions.

**8.3 Export Control Compliance.** Licensee and IFS shall comply with all applicable export control laws and regulations (including, if applicable, the Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, and the Export Administration Regulations ("EAR")) in connection with this Master Agreement. If any of the hardware, technical data, software and/or technical assistance (collectively, "Controlled Materials") to be provided to IFS by Licensee, or which may be viewed by IFS personnel, are controlled under the ITAR or EAR, Licensee shall obtain IFS' prior written approval before providing any Controlled Materials to IFS or before IFS personnel view Controlled Materials. If Controlled Materials must be exchanged or viewed, the Parties shall consult with each other to ensure the Parties' compliance with export control laws. In no event will IFS accept or receive any ITAR controlled materials in electronic or physical form on its sites or infrastructure, including email. For the purposes of fulfilling its contractual obligations to Licensee, IFS may transfer data for which Licensee is responsible to other IFS affiliates (or subcontractors) located in and/or outside of the country or countries in which Licensee operates, and such data may be accessed by foreign nationals.

**8.4 Personal Data.** If the delivery or performance of any Product involves processing by IFS of any personal data for which Licensee is responsible, then this section shall apply.

8.4.1 **Definitions.** In accordance with the definitions of the applicable national and/or EU legislation on the protection of

personal data Licensee shall be deemed the *controller* of personal data and IFS/IFS affiliate shall be deemed the *processor* of personal data.

8.4.2 **Compliance with Laws.** Each of IFS and Licensee shall comply with all applicable legislation on the protection of personal data for the purposes of this Master Agreement. Licensee shall provide IFS with reasonable instructions on the processing of personal data and IFS shall comply with such reasonable instructions. Licensee warrants that it has all necessary approvals from any relevant personal data subjects and shall indemnify and hold IFS harmless from any third party claims, losses or liabilities arising from or in connection with of the provision of personal data to IFS under this Master Agreement.

8.4.3 **Security Measures.** IFS shall implement appropriate technical and organizational security measures for the processing of personal data under this Master Agreement. IFS shall comply with EMCOR Cloud, SAAS, Hosting Best Practices Guide attached hereto as Exhibit A and will otherwise work with Licensee to ensure access to Licensee's databases is secure. Such measures shall be subject to an appropriate level of security having regard to the technical possibilities available, the implementation cost for such measures, the specific risks connected with the processing of the data in question and the sensitivity level of the data in question. For the purposes of fulfilling its contractual obligations to Licensee for Support Services and Managed Cloud Services, IFS may use personnel in the European Union, Sweden, Sri Lanka, or India (or any location other than in the United States as agreed to by the parties in writing), and the personnel providing such services may view or access personal data of Licensee or its client's data for which Licensee is responsible solely in order to provide services as follows: (i) for Support Services, when occurring outside of Support Service Hours, and (ii) for Managed Cloud Services, during Service Hours. However, in no event may any such data be downloaded, stored, or retained outside of the United States. In any event, IFS shall be responsible for the acts and omissions of those providing support services and any breach or disclosure of any personal data of Licensee or its client's date for which Licensee is responsible for as the result thereof. IFS shall be responsible for ensuring that such personnel comply with the terms of this Master Agreement. IFS shall comply with all applicable federal, state, and local laws, ordinances and codes and all lawful orders, rules, and regulations with respect to this section and defend and indemnify and hold Licensee harmless against any claim to the extent attributable to a violation of the foregoing representation and warranty.

8.5 **Non-solicitation of Employees.** Each Party acknowledges that the other Party has expended significant time, effort and expense in the hiring, training, and retention of its employees in conjunction with providing specialized services such as those provided hereunder and, therefore, shall not, during the term of this Master Agreement and for a period of one year thereafter, either directly, solicit for employment or employ any current or former employee of the other within one year of such termination of employment date, with whom such Party has had any contact during the course of this Master Agreement. This Section 8.5 shall not apply to general advertisements for employment or employees terminated by a party prior to solicitation by the other party.

8.6 **Force Majeure.** Neither Party will be liable for the delay or failure in the performance of this Master Agreement arising solely from any one or more of the following matters: a) acts of God or public enemy or war, whether declared or not; b) acts of government, any subdivision or agency thereof, and any regulation, restriction, or law imposed or enforced therefrom, except as they may result from the unreasonable failure of the concerned Party to perform as required hereunder; c) acts of persons engaged in subversive activities or sabotage; d) fires, floods, explosions or other catastrophes; e) epidemics or quarantine restrictions; f) strikes or similar labor disruptions; g) freight embargoes or interruption of transportation; h) unusually severe weather; i) any other similar causes beyond the reasonable control of the Party concerned.

8.7 **Notices**. Any notice, consent or other communication in connection with the Master Agreement must be in writing and delivered in person, by mail or by facsimile copy. If hand delivered, the notice will be effective upon delivery. If delivered by facsimile transmission, the notice will be effective when sent. If served by mail, the notice will be effective three (3) business days after being deposited with the United States Postal Service by certified mail, return receipt requested, addressed appropriately to the intended recipient, as follows:

If to Licensee: EMCOR Facilities Services, Inc.
1700 Markley Street
Norristown, PA 19401
Attn: Anthony Sada, CFO of EMCOR Building Services
With a copy to: General Counsel

If to IFS: IFS North America, Inc.
300 Park Boulevard, Suite 555
Itasca, Illinois 60143
Attn: Cindy Jaudon, President

**9. Trademarks or Propriety Material.** This Master Agreement does not grant IFS any right to Licensee (or its affiliates) trademarks or other proprietary material. Without the prior written consent of Licensee, IFS will not use the name, trademarks, logos or other proprietary material of IFS in any advertising or publicity release.

**10. Vendor Code of Conduct**. IFS and its agents, employees and subcontractors performing IFS's obligations hereunder will comply with Licensee's Vendor Code of Conduct as updated from time to time and available at https://emcorgroup.com/corporate-governance/corporate-governance-documents/ethics.

**11. Insurance.** IFS shall provide and maintain and its own expense the types of insurance shown on Exhibit B – Insurance Requirements and shall keep said insurance in full force and effect during the entire length of the Agreement.

**12. Travel and Expense policy.** If applicable, IFS shall comply with Licensee's travel and expense policy attached here to as Exhibit C - EMCOR Group, Inc. Travel and Expense Policy

**13. Order.** In the event of any conflict or inconsistency between this Master Agreement and any other contract document that forms a part of the Agreement, including terms concerning the order of precedence, the provisions of this Master Agreement will prevail.

**IN WITNESS WHEREOF,** each Party represents that it has full power and authority to enter into and perform this Master Agreement, that the person signing this Master Agreement (including any current or later Order Forms) on behalf of each Party, is properly authorized and empowered to do so, and that each has carefully reviewed it and consulted with such experts and advisors as each deemed appropriate.

**LICENSEE:**

Signed By: _Anthony Sada_
            824E0648A2D4413...

Printed Name: Anthony Sada

Title: CFO of EMCOR Building Services


**ACCEPTED at Itasca, Illinois**
**By: IFS NORTH AMERICA, INC.**

Signed By: _Cindy Jaudon_
            6131C7784EF848D...

Printed Name: Cindy J. Jaudon

Title: President

Exhibit A - EMCOR Cloud, SAAS, Hosting Best Practices Guide.

See attached

**Exhibit B – Insurance Requirements**

IFS will purchase and maintain at its own expense insurance coverages standard for companies that sell, implement, and maintain enterprise service management software, including the types of insurance shown below with the coverage specified, and shall keep the same in full force and effect for three (3) years following completion of services. All insurance policies must be written by licensed insurers authorized to conduct business in the state(s) where services are performed. All insurance companies must have AM Best's Rating of at least "A- VII" or better. The limits of liability shall be at least those shown on Schedule A - Sample Insurance Certificate.

1. **Commercial General Liability (covering Bodily Injury / Property Damage and Personal Injury as follows):**
   Standard ISO Commercial General Liability Occurrence Form, including:
   - Premises / Operations
   - Products/Completed Operations Hazard (must be maintained for 3 years beyond completion of Project, or longer as required by this Master Agreement)
   - Blanket Contractual Coverage
   - Independent Contractors
   - Personal Injury Liability

2. **Workers' Compensation / Employers Liability Insurance:**
   In accordance with the laws of the nation or state having jurisdiction over the IFS's employees. IFS shall not utilize occupational accident or health insurance policies, or the equivalent, in lieu of mandatory Workers' Compensation Insurance or otherwise attempt to opt out of the statutory Workers' Compensation system.

3. **Umbrella Liability (coverage must attach directly excess of the Primary General Liability, Auto Liability & Employers Liability Insurance):**
   The limits of liability shall be at least those shown on Exhibit A - Sample Insurance Certificate., and must be maintained for 3 years beyond completion of Project, or longer as required by this Master Agreement.

4. **Professional Liability Insurance / Errors & Omissions Insurance ("E&O"):**
   If IFS is required to perform design work, it must in addition to the above requirements, carry Professional Liability / E&O Insurance covering Bodily Injury, Property Damage, Economic Loss arising out of IFS's professional liability in the capacity for which it is being hired. Occurrence coverage is preferred. A "claims-made" E&O policy form is acceptable, but only if the retroactive date of such policy is prior to, or equal to, the date that you begin to work on the project (including pre-bid and pre-contract design work). Must be maintained for 3 years beyond completion of Project, or longer as required by this Master Agreement.

5. **Network Security/Privacy Liability including**:
   Coverage resulting from the inability of a third-party to gain access to the Insured's computer system, failure to prevent unauthorized access to or use of an Insured's computer system that results in the spread of malicious code or identity theft, and unauthorized access or use of confidential information (Personally Identifiable Information (PII), Protected Health Information (PHI), and corporate confidential information protected by a confidentiality agreement). Coverage exposure include (1) computer or network systems attacks (2) denial or loss of service (3) introduction, implantation, or spread of malicious software code (4) unauthorized Access and Use of computer systems (5) privacy liability (6) breach response coverage. The limits of liability shall be at least those shown on Exhibit A - Sample Insurance Certificate.

6. **Fidelity Insurance**:
   Blanket Fidelity Bond (Crime Insurance) endorsed with third party liability coverage in an amount of $1,000,000 covering the dishonest acts of IFS's employees performing Work under this Master Agreement. Licensee, and all other indemnities named in this Master Agreement, shall be named as a loss payee.

7. **All Other Requirements:**
   a. Should the IFS engage a sub-subcontractor, the same conditions applicable to the IFS under these insurance requirements shall apply to each subcontractor of every tier and IFS shall obtain the required insurance from each of its subcontractors.
   b. The carrying of the minimum insurance coverages required by this Master Agreement or failure to provide the required insurance certificate or endorsements, shall in no way relieve or release the IFS of any responsibility or liability under this Master Agreement in any way limit the liability of the IFS.
   c. Insurance coverage will apply independently of IFS's indemnity obligations nor does it preclude Licensee from taking other actions available to it, including the withholding of funds under this Master Agreement. The IFS is not relieved of its duties under this Master Agreement by Licensee's acceptance of insurance policies and / or certificates.
   d. Licensee and all other indemnitees required by this Master Agreement, and their respective affiliates, directors and officers, representatives, agents and employees, are Additional Insureds on all policies except Workers' Compensation/Employers Liability, E&O / Professional and Fidelity. . General Liability Additional Insureds must be equivalent of CG 20 10 11 85 (including Ongoing / Completed Operations). Fidelity (Crime) policy includes 3rd

party coverage and all Additional Insureds are included as Loss Payees. If Builder's Risk / Installation coverage is required then all Additional Insureds must be included as Loss Payees on Builder's Risk / Installation policies. IFS further agrees that the amount of insurance available to such Additional Insureds shall be for the full amount of the loss up to policy limits and shall not be limited to the minimum requirements set forth in this exhibit.

e. All insurance provided to Additional Insureds applies on a primary and non-contributory basis. Any other insurance maintained by Licensee and all other indemnitees required by this Master Agreement, and their respective affiliates, directors and officers, representatives, agents and employees, shall be in excess of and shall not contribute with IFS's insurance or its sub-subcontractor's insurance. Licensee and all other indemnitees required by this Master Agreement and their respective affiliates, directors and officers, representatives, agents and employees, are not responsible for the IFS's insurance deductible or self-insured retention.

f. Waiver of Subrogation, where not prohibited by law, is included on all policies except Professional Liability and Fidelity Insurance in favor of Licensee and all other indemnitees required by this Master Agreement, and their respective affiliates, directors and officers, representatives, agents and employees, so that in no event shall the insurance carriers have any right of recovery against Licensee and all other indemnitees required by this Master Agreement, and their respective affiliates, directors and officers, representatives, agents and employees.

g. Claims Made policies are not acceptable except or Professional Policies which must contain a retroactive date that is prior to the date the Named Insured (IFS) began Work on this Project and must be maintained for a period of at least three (3) years following completion of Project, or longer as required by this Master Agreement.

h. Certificates of insurance shall confirm that all insurance policies are endorsed so that the policies will not be materially changed or canceled without at least a thirty (30) days prior written notice to the Certificate Holder. In the event the policies of insurance policies required in this exhibit cannot be so endorsed, (a) the IFS, as an express condition precedent to payment, shall affirm that the required insurance remains in place and said insurance has not been canceled or (b) should said insurance be canceled, IFS shall provide thirty days prior written notice of cancellation to the Certificate Holder. Licensee's acceptance of a certificate shall not release IFS from the obligations set forth in this exhibit.

i. Upon Licensee's written request, copies of IFS's insurance policies must be provided within twenty (20) days of the request.

j. All Self Insured Retentions ("SIR's) must be disclosed on the certificates and may not exceed twenty five thousand dollars ($25,000) without prior written authorization from Licensee.

k. If the IFS, for any reason, requires and / or carries any type of insurance and / or increase in limits of liability above those required by this Master Agreement, all costs related to this excess insurance / increased limits shall be the responsibility of the IFS.

l. If IFS fails to procure and maintain the insurance required by this exhibit, Licensee shall have the right, but not the obligation, to procure and maintain such insurance for and in the name of IFS, and IFS shall furnish all information necessary to obtain and maintain such insurance. IFS shall pay all costs associated with Licensee obtaining and maintaining such insurance, and Licensee may offset such costs against amounts otherwise payable to IFS.

Schedule A – Sample Insurance Certificate

See attached

Exhibit C - EMCOR Group, Inc. Travel and Expense Policy

See attached