UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IFS NORTH AMERICA, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | 24 C 749 |
| | ) | |
| EMCOR FACILITIES SERVICES, INC., | ) | |
| | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Plaintiff/Counter-Defendant IFS North America, Inc.'s ("IFS") Motion to Dismiss Defendant/Counter-Plaintiff EMCOR Facilities Services, Inc.'s ("Emcor") Counter-Complaint under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, IFS's motion is denied.

## BACKGROUND

At a high level, Emcor's Counter-Complaint ("Emcor Complaint") alleges that, to secure a lucrative contract to provide Emcor with an enterprise-level software solution, IFS made material representations regarding the functionality of its software. Over the course of three years, Emcor paid IFS millions of dollars and provided IFS with thousands of hours of support. Yet Emcor never received a fully functioning software solution.

The following facts come from the Emcor Complaint and are assumed true for the purpose of this motion. *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013). All reasonable inferences are drawn in Emcor's favor. *League of Women Voters of Chi. v. City of Chicago*, 757 F.3d 722, 724 (7th Cir. 2014).

Emcor provides state-of-the-art facilities management services to its customers. IFS purports to be a sophisticated, global enterprise software solution provider. Beginning in 2019, Emcor sought to upgrade its software to implement a single platform, enterprise-level system. Emcor sought bids from software solution providers (including IFS) and issued a "Request for Proposal." Emcor asked each bidder to complete a questionnaire and rate themselves on 1,121 separate categories of specifications for Emcor's system on a scale from 0 to 4. A score of "4" indicated that the requested functionality was provided as standard and that the "software fully supports the requirements." Emcor Complaint, ¶ 17. The instructions stated: "By answering a question affirmatively, the vendor agrees to support such capabilities within the product." *Id*.

IFS rated itself a "4" with respect to the feature "Platforms: Mobile: iOS (iPhone or iPad)." Dkt. # 15-2, at 47. In addition, IFS stated it could provide a robust software solution despite Emcor's high contract volume. IFS quoted $648,400 for implementation of the software system, and another $285,000 for post-deployment support.

Based on these representations, on February 6, 2019, Emcor and IFS entered into a Master Agreement ("MSA") and simultaneously executed a Managed Cloud Order Form and Professional Services Order Form. The MSA included a warranty providing that "Professional Services will be performed in a professional manner by qualified personnel." Emcor Complaint, ¶ 24.

Early in the development process—before any of Emcor's customers could be transferred to the IFS System—IFS sought an additional $375,000 payment for development costs even though Emcor had not requested any additional functions or business requirements. Approximately six months later, Emcor began transferring some of its smaller-sized customers to the new IFS System to see if it worked. Several issues arose.

For example, there was a problem with the Tech Portal used by Emcor's technicians. "Specifically, horizontal and vertical scrolling functionality on tablets (*e.g.*, iPads) was inconsistent at best, and fully non-operational at worst," making the Tech Portal unusable for the vast majority of Emcor's business. Emcor Complaint, ¶ 27. In addition to the lack of functionality on iPads, the Tech Portal was also not operational on smart phones (*e.g.*, iPhones). During a meeting several months later regarding the iPad scrolling issue, IFS admitted that it previously had no customers that used the Tech Portal on an iPad, and further admitted it had never tested whether the Tech Portal worked on iPads.

IFS again sought an additional payment from Emcor to cover more development costs. Emcor disputed this request because the work proposed was well within scope of IFS's original proposal. However, IFS refused to perform any work, including work on fixing the Tech Portal, unless Emcor agreed to pay. Given that the IFS System was in mid-development and already behind schedule for deployment, and Emcor was under significant pressure because it had already told its customers that it would be implementing the IFS System, Emcor agreed to pay.

In February 2022, Emcor notified IFS of an issue in the system which prevented Emcor from "uploading and posting the required data points (contract lines) for multi-site customers." Emcor Complaint, ¶ 36. Despite knowing of this requirement since day one, IFS indicated that it may not be able to provide a workable solution.

This was the first time in the parties' three-year relationship that IFS suggested it could not handle Emcor's large service volume. So, later that month, senior leadership of Emcor and IFS met to discuss the problems with the IFS System. Emcor followed up this meeting by sending a formal Cure Notice in March 2022, a prerequisite under the MSA for contract termination.[1] At and after the meeting, IFS renewed its promise to provide a workable solution.

---

[1] The MSA states: "5.2 Termination. This Master Agreement may be terminated by either Party in the event the other Party fails to perform any of its material obligations hereunder and fails to remedy such nonperformance within the time permitted herein within 30 days after written demand. . . . [E]ach Party is entitled to written notice and 30 days to cure the failure except that for subsequent failures of the same kind (e.g. second failure to make timely payment) the notice cure period is 5 days." Complaint, Ex. A § 5.2.

4

Having invested millions of dollars and three years of development into the IFS System, Emcor continued to work with IFS to resolve the issues with the IFS System. During this time, IFS began to pressure Emcor to enter into a subscription renewal agreement. Despite the outstanding issues, Emcor agreed to enter into a subscription renewal agreement provided that IFS would specifically warrant that it would provide Emcor with a workable solution. IFS agreed to include warranty language in the renewal agreement which allowed for its termination if IFS did not deliver a workable solution.[2]

Although Emcor continued to work with IFS, it ultimately became clear that IFS would be unable to deliver. Thus, in November 2022, Emcor sent IFS a termination letter pursuant to Section 5.2 of the MSA.

Thereafter, IFS filed a breach of contract action against Emcor. Emcor, in turn, filed its own case, asserting fraudulent inducement and breach of contract claims. The two cases were subsequently consolidated.

IFS now moves to dismiss Emcor's Complaint, arguing Emcor's fraudulent inducement claim fails to meet the pleading requirements of Rule 9(b) and, even if it

---

[2] The agreement provides: "Warranty. IFS warrants that the Application Software will perform substantially as described in the Software Documentation for a period of 12 months from the date of this Order Form. If IFS breaches this warranty, Customer's sole and exclusive remedy is for IFS, in consultation with Customer, to use reasonable efforts consistent with industry standards to cure the defect or otherwise to redeliver the Application Software so that it substantially complies with the Software Documentation; if IFS is unable to do so, Customer will have no further payment obligations to IFS under this Order Form, IFS will refund any payments made by Customer to IFS pursuant to this Order Form, and this Order Form will terminate." Dkt. # 15-4, at 4.

5

did, Emcor does not identify any actionable misrepresentations to support the claim. IFS further asserts that Emcor's breach of contract claim fails because Emcor did not honor its obligations under the MSA.

## LEGAL STANDARD

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotation marks and citation omitted); s*ee also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts the plaintiff's well-pleaded factual allegations as true and draws all possible inferences in the plaintiff's favor. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011).

Ordinarily, a plaintiff need not plead "detailed factual allegations" but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quotation marks and citation omitted). However, under the heightened pleading standard of Rule 9(b), a plaintiff alleging fraud as Emcor does in Count I, "must state

with particularity the circumstances constituting fraud." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

## DISCUSSION

### I. Fraudulent Inducement

To state a claim for fraudulent inducement, Emcor must allege: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003); *see also Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783 (7th Cir. 2014). As with other types of fraud claims, fraudulent inducement claims must be pled with particularity pursuant to Rule 9(b). *See Lesaint Logistics, LLC v. Electra Bicycle Co., LLC*, 146 F. Supp. 3d 972, 980 (N.D. Ill. 2015).

As an initial matter, the Court agrees with IFS that Emcor's Complaint fails to meet the pleading requirements of Rule 9(b) with respect to allegations that IFS

7

misrepresented its "capabilities to provide . . . a software solution that fit [Emcor's] needs," Emcor Complaint, ¶ 1, its "capacity to handle the contractual volume that [Emcor's] multi-site customers presented," *id.* ¶ 5, and "its ability to correct the substantial issues with its system once they were identified," *id.* ¶ 49. Emcor's fraudulent inducement claim, to the extent it is based on these conclusory allegations, is dismissed without prejudice.

However, Emcor has cleared Rule 9(b)'s high hurdle with respect to IFS's alleged misrepresentation of "its tablet and smartphone functionalities" in responding to Emcor's questionnaire by rating itself a "4" (meaning its "software fully supports the requirements") with respect to "iOS (iPhone or iPad)." Emcor Complaint, ¶¶ 17–18, 48. The allegations provide the when, where, and how, and the identity of the specific individual who completed the questionnaire is information that is in IFS's control, not Emcor's.

IFS argues that "or" doesn't mean "and." True enough, says Emcor, but as used in the questionnaire, "or" does not have a limiting effect—Emcor needed functionality for iOS devices, regardless of whether they were iPhones or iPads. IFS further contends that it didn't know its statement to be false. Emcor alleges that the "horizontal and vertical scrolling functionality on tablets (e.g., iPads) was inconsistent at best, and fully non-operational at worst." Emcor Complaint, ¶ 27. IFS argues that "a bug in one software feature does not establish that the software could not be loaded onto a particular kind of hardware or that the software as a whole did not work." Dkt. # 44, at

8

8. But Emcor doesn't contend that the software couldn't be loaded onto iPads; it asserts that the software didn't function when *used* on iPads.

Additionally, Emcor alleges that the IFS System didn't work on iPhones, and that IFS had never tested the system on iPads.[3] Thus, Emcor says, even if the questionnaire prompt is read in the light most favorable to IFS, IFS's response still constitutes a representation IFS either knew was false or was made with "reckless disregard for its truth or falsity." *See Hoseman*, 322 F.3d at 477 (citation omitted). The Court agrees.

IFS argues Emcor fails to allege facts showing the alleged misrepresentation was material and that Emcor justifiably relied on that misrepresentation. More specifically, IFS says that Emcor cannot seriously claim that "IFS's response to the 1,215th row of Emcor's 1,249-part questionnaire made all the difference to its software-selection decision." Dkt. # 44, at 9. In IFS's view, Emcor's assertion that "smartphone and tablet functionality" were key to its operations "does not show that 0.1 percent of IFS's questionnaire responses moved the needle for Emcor's decision." *Id.* But given Emcor's allegations regarding the importance of mobile platform functionality to its business, one could reasonably infer at this stage that a rating of less than "4" on this particular topic could have caused Emcor to act differently. The materiality of the

---

[3] IFS asserts that customer use is different than internal testing, and "two things can be true at once: (1) no customers had used the Tech Portal on an iPad before, *and* (2) IFS had tested the Tech Portal's compatibility on iPads." Dkt. # 44, at 6 (emphasis in original). But at this stage, we presume the truth of Emcor's factual allegations—that IFS "had not ever tested whether the Tech Portal would even work on an iPad." Complaint, ¶ 50.

9

alleged misrepresentation is a factual question unsuitable for resolution on a motion to dismiss.

The Court also concludes that Emcor has sufficiently alleged justifiable reliance. Reasonable reliance is ordinarily a question of fact, and "where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation." *Pack v. Maslikiewicz*, 2019 IL App (1st) 182447, ¶ 105 (citation omitted); *see also Wigod*, 673 F.3d at 569 ("Under Illinois law, justifiable reliance exists when it was reasonable for plaintiff to accept defendant's statements without an independent inquiry or investigation.") (internal quotation marks omitted).[4] Emcor had no reason to doubt IFS's claims regarding its system's functionality. At this juncture, the Complaint's allegations support a fair inference that Emcor reasonably relied on IFS's alleged misrepresentation.

For these reasons, IFS's motion to dismiss is denied as to the fraudulent inducement claim.

## II. Breach of Contract

To sufficiently plead its breach of contract claim, Emcor must allege: (1) the existence of a valid and enforceable contract, (2) performance by Emcor, (3) breach by IFS, and (4) resultant injury. *Burkhart v. Wolf Motors of Naperville, Inc.*, 2016 IL App

---

[4] Illinois courts use "justifiable reliance" interchangeably with "reasonable reliance." *See Metro. Cap. Bank & Tr. v. Feiner*, 2020 IL App (1st) 190895, ¶ 47.

(2d) 151053, ¶ 14. There is no dispute that the parties in this case entered into a valid contract—the MSA. Emcor alleges IFS breached the MSA by "wholly failing to provide a workable software solution for [Emcor] and by failing to provide professional services as required by the MSA." Emcor Complaint, ¶ 59. IFS argues Emcor's claim cannot go forward because Emcor did not perform its contractual obligations and IFS did not breach the contract.

Under the MSA, if either party believed the other had breached its material obligations, that party must provide written notice of the alleged breach and give the other party thirty days to cure the breach. According to IFS, Emcor failed to honor its obligations under the MSA because it denied IFS the opportunity to cure the alleged defects in iPad performance.

IFS argues Emcor's March 2022 Cure Notice[5] and November 2022 termination letter do not mention iPhone or iPad performance issues, much less describe them as "material obligations." Emcor counters that the Complaint alleges that senior leadership of Emcor and IFS met in late February 2022 to discuss IFS's "numerous failings," including the mobile device functionality issues. By that time, Emcor had "repeatedly provided IFS with notice of serious issues in the system during weekly

---

[5] The Cure Notice specifically stated, in relevant part, "Please allow this correspondence to serve as notification of IFS's failure to perform its material obligations under the Agreement as required by Section 5 of the Agreement. Specifically, IFS's product has failed, and IFS has failed to perform Professional Services as required by the Agreement. Because IFS has failed to provide a functional contract set up and maintenance system, [Emcor's] licenses are currently only 12% functional and have been considerably lower since the inception of the Agreement." Complaint, Ex. D.

11

project meetings." Dkt. # 37, at 16. Emcor says that the March 2022 Cure Notice, in citing IFS's "failure to perform its material obligations" and "fail[ure] to perform Professional Services," incorporated by reference the contents of the February 2022 meeting (where mobile device functionality issues were specifically discussed). *See* Emcor Complaint, Ex. D ("As you are aware, the parties to the Agreement met on February 28, 2022 as required by the Agreement to discuss the above referenced IFS breaches.").

IFS, on the other hand, asserts that the written cure notice "plainly confirms that the parties' in-person meeting concerned *only* the issues actually listed in the notice— not iPad scrolling problems." Dkt. # 44, at 12. Thus, IFS argues, Emcor's failure to provide written notice of the iPad scrolling issue denied IFS the opportunity to cure. However, whether iPad scrolling is a "material obligation" need not be determined now, for the Cure Notice referenced other issues (i.e., contract loading) for which IFS was given the opportunity to cure. In Emcor's view, those issues, of which IFS had written notice, were never resolved and it was those issues that were the subject of the termination letter. Emcor has plausibly alleged IFS had appropriate written notice. And, whether the iPad scrolling issue was discussed when the parties met in February 2022 requires a more robust factual record.

IFS also contends that Emcor's ratification overrides any contract-loading concerns. More specifically, IFS argues that although Emcor listed contract-loading issues in the Cure Notice, Emcor "subsequently ratified IFS's fix of that issue when it

12

executed the parties' June 2022 subscription renewal agreement." Dkt. # 44, at 12. In IFS's view, execution of the renewal agreement "ratified the partes' intent to continue working together, [and] gave IFS every reason to believe that any such issue was resolved." Dkt. # 15, at 18.

But Emcor cries foul, arguing that it only entered into the renewal agreement because IFS "pressured" it to do so and promised it would resolve the outstanding issues. In the Court's view, it is too big of a leap to conclude at this point that Emcor's entry into the subscription renewal agreement vitiates the concerns raised in the Cure Notice or implies that those concerns were assuaged. This was an ongoing project.

Next, IFS argues that a disclaimer in the MSA forecloses Emcor's breach of contract claim. Specifically, the disclaimer provides that "IFS does not represent or warrant that the Software will be constantly available, error free or never interrupted" and that Emcor "is solely responsible for the selection, use, and suitability of the Software for [Emcor's] purposes, even if IFS has been informed of such purposes." Emcor Complaint, Ex. A § 6.3.5.[6] Emcor, however, argues that it alleged a breach by IFS "that falls well outside the ambits of this disclaimer. Specifically, [Emcor] has

---

[6] "6.3.5 Disclaimer. Subject to any applicable Service Level Targets and penalties in a Managed Cloud Order Form, IFS does not represent or warrant that the Software will be constantly available, error free or never interrupted. While IFS attempts to identify the functions of the IFSAS which may be of particular benefit to Licensee, only Licensee is in a position to understand its current and future business needs and commit the necessary complementary resources to benefit from the software and, therefore, is solely responsible for the selection, use, and suitability of the Software for Licensee's purposes, even if IFS has been informed of such purposes." Complaint, Ex. A § 6.3.5.

13

alleged that the software system was *entirely* non-functional as to [Emcor's] core business; it did not simply fail to be 'constantly available' or 'error free.'" Dkt. # 37, at 18.

Emcor accuses IFS of advancing an absurd interpretation of the disclaimer "that essentially renders meaningless any obligation of IFS to provide working software; under IFS's argument, any software issues (no matter how pervasive or fatal) are simply 'bugs' for which IFS would not be responsible because it never promised that the software would be 'error free.'" Dkt. # 37, at 18. Emcor further argues that because under IFS's interpretation the disclaimer would remove all or part of IFS's liability, it is an exculpatory clause and "must be construed against IFS and cannot be read as overriding other provisions in the parties' agreements that imposed obligations upon IFS to deliver a workable system." Dkt. # 37, at 18–19 (citing *Dreampak, LLC v. Infodata Corp.*, 2019 WL 3410221, at *5 (N.D. Ill. July 29, 2019).

At this stage, the record is not developed enough to determine whether the issues encountered with the IFS System fall within the scope of the disclaimer. IFS makes a strong argument, but it's an argument better suited for summary judgment.

## **CONCLUSION**

For the foregoing reasons, IFS's Motion to Dismiss [14] is denied. It is so ordered.

_____
Charles P. Kocoras
United States District Judge

Date: September 26, 2024